BANNUM, INC., Appellant/Cross
Appellee,

v.

2210 ADAMS PLACE, N.E., LLC,
Appellee/Cross Appellant.

Nos. 08–CV–291, 08–CV–652, 08–
CV–1023, 08–CV–1031.

District of Columbia Court of Appeals.

Argued Jan. 14, 2010.

Decided Sept. 2, 2010.

Shawn C. Whittaker, Rockville, MD, for appellant.

Emilie Fairbanks, with whom Phillip L. Felts, Bethesda, MD, was on the briefs, for appellee.

Before REID and KRAMER, Associate Judges, and SCHWELB, Senior Judge.

KRAMER, Associate Judge:

This case concerns a dispute between Bannum, Inc. ("Bannum" or "Tenant"), a Kentucky corporation that operates correctional facilities under contract with the Bureau of Prisons ("BOP"), and 2210 Adams Place, N.E., LLC ("Landlord"), a Maryland company that owns the commer-

cial property at the corresponding address. The landlord alleges that the tenant breached its lease agreement by vacating the premises without notice and by subsequently failing to remove the alterations it had made to the property. After a bench trial, the court determined that the tenant breached the lease and owed rent as a tenant at sufferance during the period it held over. The court also awarded the landlord the cost of repairs to the property, but, finding that the alterations the tenant made to the property had actually increased its value, it refused to award any additional damages for the tenant's failure to restore the premises. Both sides appealed. On appeal, Bannum contends that it was prejudiced by the landlord's failure to refer to the lease's holdover clause before closing arguments. Bannum further argues that it incurred no liability under the holdover clause due to a limit on its liability after the lease expired, or, alternatively, because it timely surrendered the premises. The landlord cross-appeals and claims that it was entitled to the costs of the restoration in addition to the unpaid rent and cost of repairs. Both parties additionally contest the trial court's decision to award a portion of the landlord's attorney's fees as the partially prevailing party. We affirm the trial court's decision in its entirety.

## I. Factual Background

In July 2002, Bannum entered into a lease agreement in order to operate a correctional facility at 2210 Adams Place, a commercial property configured as a warehouse at the time. The agreement explicitly stated that the tenancy would run concurrently with Bannum's BOP contract,

and that the lease would "become null and void immediately" when the BOP contract terminated. The agreement allowed Bannum to make alterations to the property to meet the BOP's requirements, except that it required the removal of the improvements "if requested to do so by Landlord in writing before the expiration of the [lease] term." After making necessary changes, such as the installation of dormitories, bathrooms and the like, Bannum operated a correctional facility on the premises from 2003 to early April 2006.

The landlord-tenant relationship seems to have come under strain almost immediately. In October 2003, the landlord filed suit to eject Bannum, which was stayed when Bannum countersued, alleging a breach of the covenant of quiet enjoyment.[1] In addition, the District of Columbia sought to revoke Bannum's zoning permit shortly after it began operating the correctional facility. Some time around March 2006, Bannum lost the zoning dispute and its permit. Though the parties dispute the exact date, the trial court found that the BOP terminated Bannum's contract "at the latest on April 6th, 2006." On April 7, 2006, the landlord's representatives arrived at the premises, ostensibly to carry out an inspection,[2] only to find them vacant. The inmates had been moved. Unable to secure entry, the landlord sent a letter to Bannum that same day, stating that the property appeared to be abandoned and inquiring about Bannum's intentions with respect to the lease. On April 14, 2006, the inspection took place, and Bannum turned over the keys to the landlord. The landlord then demanded that Bannum remove the alterations it

---

1. It appears that both suits were still pending at the time Bannum's BOP contract expired.

2. The trial court did not credit appellee's witnesses' testimony that they arrived at 2210

Adams Place on April 7, 2009 by coincidence, unaware that something may have gone awry with Bannum's BOP contract.

had made to the property. Bannum's counsel responded in writing on June 6, 2006, arguing that the tenancy had ended in April 2006 when Bannum vacated the premises and refuting that Bannum was obligated to restore the premises or remit rent for the period between April and June.

On September 20, 2006, the landlord sued Bannum. The single count of the complaint, entitled "Breach of Lease," alleged that the tenant had vacated the premises "on or around April 9, 2006, with rent due and owing" and had failed to restore said premises "to the condition they were in at the commencement of the [l]ease." Though the complaint demanded unpaid rent, it did not mention the lease's tenancy at sufferance clause.[3] At trial, the court interpreted the expert testimony provided by both parties to find that the value of the premises had not decreased (and may even have increased) as a result of the tenant's modifications. The trial court also found that the landlord had started advertising the property for rent around May 2006 and eventually succeeded in leasing it to the District of Columbia, which in turn started to operate a homeless shelter on the premises. As it became clear that it would not prevail with its "failure to restore" argument, the landlord in closing argument contended that Bannum owed rent as a tenant at sufferance because it had failed to timely surrender the premises.

In light of the fact that the premises were at least as valuable in their current configuration as they would be without Bannum's alterations, the court held that the landlord had failed to prove damages on its restoration claim. The court also dismissed Bannum's objection to the belated reference to the lease's holdover provision, holding that the argument was "no more than an interpretation of the Lease that is in evidence.... [Bannum] cannot claim surprise that [the landlord] asks the court to determine [Bannum's] obligations by reading the Lease."

## II. Legal Analysis

■ Both parties have alleged error below. We consider each appeal in turn. In doing so, we apply general contract interpretation principles to parse the lease.[4]

### A. Bannum's Appeal

■ Bannum contends that it is not liable as a tenant at sufferance. First, it objects to the late introduction of the issue during trial as an unfair surprise. Second, it contends that it has incurred no liability under the clause because of the lease's post-expiration prohibition on liability, or alternatively, because it surrendered the premises as required and therefore did not become a tenant at sufferance in the first instance.

### i. Unfair surprise

■ Bannum claims that the trial court erred in allowing the landlord to claim the

3. That clause stated:
    If tenant shall not immediately surrender the premises on the day after the expiration or termination of the term, then tenant shall, by virtue of this lease, become a tenant at sufferance at a monthly rent equal to one hundred fifty percent of the monthly installment of the Base Annual Rent due under the terms of the lease. Tenant as a tenant at sufferance shall be subject to all

the conditions and covenants of this lease.... During any holdover period each party shall give to the other at least thirty days prior written notice to quit the premises....

4. *Saul Subsidiary II Ltd. P'ship v. Venator Group Specialty, Inc.*, 830 A.2d 854, 861 (D.C. 2003).

tenant at sufferance clause for the first time during closing argument. It points out that the landlord never referenced the clause in its pleadings, motion for summary judgment, or in the joint pretrial statement. Bannum relies on *Nelson v. Allstate Insurance Co.*[5] to assert that the landlord should have referenced the tenancy at sufferance clause in the joint pretrial order. Bannum's reliance is misplaced. First, we have never countenanced a "rigid adherence" to the contents of a pretrial order.[6] Moreover, in determining whether a party was "surprised or prejudiced" by the other party's venture beyond the contents of the pretrial order, the law of this jurisdiction places the decision to allow such endeavors firmly in the hands of the trial court.[7] Finally, in *Nelson* itself, we found, on facts very similar to those at bar, that the defendant's negligence in failing to reference the specific contract clauses on which it intended to rely did not amount to a surprise for the plaintiff who "could not plausibly claim ignorance of [the contractual] terms" where the contract was central to the case.[8] Here, the lease was similarly central to the case, and the pretrial order includes as disputed issues whether Bannum owed unpaid rent as well as the date when Bannum surrendered the premises. Bannum therefore cannot claim to have been surprised when the landlord specifically referenced the tenancy at sufferance clause during closing arguments, at least not to the extent that we can say that the trial judge abused her discretion in allowing the landlord to do so.[9]

### ii. The validity and application of the tenancy at sufferance clause

Bannum also argues that the tenancy at sufferance clause was inapplicable because (a) it had no liability under the lease after it had expired, or (b) even if the clause did apply, it had surrendered the premises as required.

■ We first dispose of the threshold argument. Bannum appears to rely on the clause that stated "Bannum will have no further liability under the lease after its expiration" to argue that it had no liability under the tenancy at sufferance clause because the lease had expired when the clause went into effect. This defies the very nature of a tenancy at sufferance, which arises, by definition, after a lease expires. Any interpretation of the "no further liability" clause that would insulate Bannum from *all* liability once the lease expired would make the tenancy at sufferance clause a nullity since it could never become effective. Rather than read the tenancy at sufferance clause out of the contract, the better approach is to recognize that the liability for a tenant at sufferance does not arise under the lease but is imposed by law on a tenant wrongfully holding over.[10] Thus, here, the tenancy at sufferance clause existed to regulate the

---

**5.** 753 A.2d 1001 (D.C.2000).

**6.** *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C.1973).

**7.** *Nelson, supra* note 5, 753 A.2d at 1004–05.

**8.** *Id.* at 1005.

**9.** This is not to say that we would condone a case where the decision was reached "on the basis of a record in which the parties did not focus upon [the central] issues." *See Bahura v. S.E.W. Investors*, 754 A.2d 928, 947 n. 18 (D.C.2000).

**10.** *A.H. Fetting Mfg. Jewelry Co. v. Waltz*, 160 Md. 50, 54, 152 A. 434 (1930) ("It seems the better view [is] to regard the liability of the tenant wrongfully holding over as one imposed by law on the tenant, without his express or implied consent, and enforceable in an action at law as a quasi contractual obligation in order that justice may be done between the parties.").

parties' relationship and obligations after the lease expired. Though the conditions of the tenancy at sufferance were specified in the lease, Bannum's liability did not arise under it, so the "no further liability" clause could not insulate it from liability when it became a tenant at sufferance.

■ Bannum also argues that it "surrendered" the premises the day after the cancellation of the BOP contract, as required by the tenancy at sufferance clause.[11] It points out, correctly, that this court has distinguished "vacating" demised premises from "abandoning" them in the context of a commercial lease agreement, in that the latter requires an intent component and the former does not.[12] In *Saul Subsidiary II*, we construed the meaning of the word "vacate" by referring to its common meaning,[13] which includes "surrender by removal."[14] This lease uses the word "surrender." Because Bannum had vacated the premises by April 7, 2006, it argues, it had in fact "surrendered" them under *Saul Subsidiary II*, and therefore was not holding over. This argument lacks merit. The fact that the meaning of vacate may include surrender by removal is not dispositive. "Surrender" is not synonymous with "vacate," nor does its plain meaning include "vacate." While it is true that premises must be "vacated" in order to "surrender" them, this is not the only requirement to effect a surrender. For a tenant to be able to say that it "surrendered" the premises, it needs to do more than simply vacate. "Surrender" has the plain meaning of "[t]he act of yielding to another's power or control."[15] The evidence at trial established that the landlord

could not enter the premises until April 14, 2006 at the earliest. The inability of the landlord to gain entry indicates that the premises were not in its power or control. Therefore, the premises could not have been "surrendered" until April 14, 2006. Since the trial court found that the lease had terminated on April 6, 2006 at the latest, Bannum became a tenant at sufferance by virtue of the requirement that it "immediately surrender the premises on the day after the expiration or termination of the [lease]."[16] We therefore affirm the trial court with respect to this issue.

### iii. The award of damages for the damaged HVAC unit on the premises

■ After the landlord re-entered the premises, it found that the HVAC unit was damaged and required repairs. The lease required Bannum to turn over the HVAC in good working order. Bannum argues that the landlord failed to prove that the damage occurred during Bannum's tenancy because the landlord's witnesses could not inspect the premises until April 14, 2006, notwithstanding the apparent irony of its contention that it had surrendered the premises to the landlord by April 7, 2006. Therefore, argues Bannum, the landlord could not prove that the HVAC was damaged during Bannum's tenancy. There was conflicting testimony on this issue at trial. Nevertheless, the trial court found that it was more likely than not that the damage had occurred during Bannum's tenancy. Since there was some factual basis for that conclusion, we cannot say

---

11.  See *supra* note 3.

12.  *Saul Subsidiary II, supra* note 4, 830 A.2d at 861.

13.  *Id.* (citing Black's Law Dictionary 1794 (3d Ed. 1933)).

14.  *Id.*

15.  Black's Law Dictionary 1484 (8th Ed. 2004).

16.  See *supra* note 3.

that the judge clearly erred in finding thus.

### B. The landlord's appeal

█ It is undisputed that Bannum breached the lease by failing to restore the premises after the lease expired. Specifically, Bannum was required to remove all water heaters and fixtures, as well as the plumbing and interior walls, and restore the loading dock, leaving behind an unimproved warehouse instead of a warehouse "upgraded" to house a correctional facility. Bannum did not do so. But it introduced expert testimony to prove that the alterations had increased the value of the premises. The landlord's real estate manager contested the valuation of Bannum's expert, but conceded that the alterations did not decrease the value of the premises. After considering both sides' contentions, the trial court found that the rental value of the premises had increased due to Bannum's alterations. The trial court found it significant that the landlord has not carried out any restoration on its own and that Bannum's alterations have made it possible to lease the premises to the District of Columbia, which operates them as a homeless shelter.

The landlord nevertheless maintains that it was entitled to the benefit of its bargain. It urges us to follow *American Standard, Inc. v. Schectman,*[17] where a contractor, in return for the equipment and structures on an industrial site, had promised to "remove the equipment, demolish the structures and grade the property as specified." The court affirmed the award of "cost of completion" damages against the contractor.[18] Even though the contractor offered proof that its failure to perform only diminished the value of the property by $3,000, the court upheld the $90,000 jury verdict. *American Standard* held that "diminution in value" damages are available where "there has been a substantial performance of the contract made in good faith but defects exist, the correction of which would result in economic waste,"[19] but only if the defects in the structure require substantial destruction to remedy, or where the breached covenant is only incidental to the main purpose of the contract and completion would be disproportionately costly.[20] On the basis of those facts, "cost of completion" damages were appropriate because "completed performance would not have involved undoing what in good faith was done improperly but only doing what was promised and left undone."[21] The landlord claims that the facts here are "closely related," and *American Standard* should control.

We are not convinced. *American Standard* involved a contractor who had bargained for and received consideration specifically to perform the alterations to the plaintiff's property. Here, the main purpose of the lease agreement was not to restore the landlord's property, but to convey a limited estate from the landlord to the tenant to the mutual benefit of both parties. In an effort to bridge this conceptual gap, the landlord hypothetically claims that "[h]ad Bannum been given $100,000 to restore the premises and then failed to do so, under the trial court's ruling, Bannum would have been entitled to keep the $100,000." With this hypothetical, the landlord exposes the fatal flaw in its con-

---

17. 80 A.D.2d 318, 439 N.Y.S.2d 529 (4th Dep't.1981).

18. *Id.* at 319–20, 439 N.Y.S.2d at 530.

19. *Id.* (citations omitted).

20. *Id.* at 322–23, 439 N.Y.S.2d at 532–33 (citations omitted).

21. *Id.*

tention. Bannum was not, in fact, given any consideration to restore the premises. If Bannum had been hired to perform the restoration, then *American Standard* would have been a more appropriate authority to cite. As it is, we are persuaded by the case relied on by the trial court in its opinion. *Bowes v. Saks & Co.*[22] involved a dispute over a tenant's failure to restore the demised premises after the lease had expired. Applying the "economic waste" theory, the Court held that:

> The undisputed facts, and the disputed facts taken as Lessors see them, plainly show that Lessors have suffered no damage as a result of [tenant's] failure to restore the premises. Consequently, cost of repair damages would be wholly unrelated to the loss, which does not exist. The diminution of value rule yields Lessors nothing because [tenant's] conduct did not cause a diminution.
>
> Lessors cannot claim as damages the out-of-pocket expenditures required to perform the restoration. No such expenditures have occurred. Furthermore, no such expenses will occur.[23]

■ Similarly, the landlord has suffered no damage here. It has not performed any restorations on its own, nor will it, since the current configuration of the premises as a homeless shelter depends entirely on keeping Bannum's alterations intact. Finally, the law of this jurisdiction also counsels that we apply the "economic waste" theory.[24] We therefore affirm the trial court's order with respect to the lack of damages caused by Bannum's failure to restore the premises.

## C.  Attorney fee award

■ We review an award of attorney fees for an abuse of discretion, which is "firmly committed to the informed discretion of the trial court."[25] The trial court held that the landlord had succeeded in all its claims, and awarded attorney fees. At the same time, because the landlord had failed to win all the damages it had sought, the court reduced the fee award by 33%. Because we cannot say that the trial court abused its considerable discretion under the prevailing standard,[26] we affirm.

## III.  Conclusion

Neither party's arguments succeed in convincing us of an error in the order below. The trial judge is in the best position as the adjudicator of facts, and we see no abuse of discretion in her factual conclusions. Furthermore, we can detect no legal error in her conclusions of law. Therefore we find no basis for reversal.

*Affirmed.*

22.  397 F.2d 113 (7th Cir.1968).

23.  *Id.* at 117.

24.  *See Fortune v. Evans*, 58 A.2d 919, 920 (D.C.1948) ("[Where] remedy of the defect will usually require more than a reasonable expenditure, resulting in an unreasonable economic waste[,] ... the measure of damages is not the cost of replacing the defective work, but is the difference between the value that the work would have had if performed according to the contract and the value of the work as actually performed.").

25.  *Steadman v. Steadman*, 514 A.2d 1196, 1200 (D.C.1986).

26.  *Allen v. District of Columbia*, 503 A.2d 1233, 1236 (D.C.1986) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)) ("A typical formulation is that plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any *significant* issue in litigation which achieves *some of the benefit* the parties sought in bringing suit.") (emphasis in original) (internal quotation marks omitted).

SCHWELB, Senior Judge, concurring in part and dissenting in part:

I agree with, and I am pleased to join, all of Judge Kramer's persuasive opinion except Part III C, in which the court affirms the trial judge's award of counsel fees to the landlord. As to that issue, I agree that the landlord was entitled to recover some of its counsel fees,[1] but I would vacate the award and remand for a more practical assessment of the degree to which the landlord prevailed and of the amount that should be awarded.

I recognize that "a request for attorney's fees should not result in a second major litigation." *Fleming v. Carroll Pub. Co.*, 581 A.2d 1219, 1229 (D.C.1990) (*Fleming I*) (quoting *Pierce v. Underwood*, 487 U.S. 552, 563, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). I also agree that the amount to be awarded is "firmly committed to the informed discretion of the trial court." Maj. op. at p. 439; *Steadman v. Steadman*, 514 A.2d 1196, 1200 (D.C.1986). Nevertheless, appellate courts have a role to play in the process, and our review is not toothless.

As the trial judge appropriately recognized in awarding the landlord counsel fees in the amount of $18,240.60 (a sum which represented two-thirds of the landlord's

documented fees, after subtracting certain relatively minor deductions),

> [t]he degree of success in litigation is a relevant factor in the award of attorney's fees. Statutes awarding attorney's fees normally limit such a right to the 'successful' or 'prevailing' party.... The same general concept seems to be applied ordinarily in the interpretation of contractual provisions for attorney's fees. [*Fleming I*], 581 A.2d at 1228, "[I]n such cases where a party is only partially successful, the trial court must exercise its discretion to determine what amount of fees, if any, should be awarded." *Id.* at 1229 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436–37 [103 S.Ct. 1933, 76 L.Ed.2d 40] (1983)).

Order of July 3, 2008, at p. 4.

Relying on our decision in *Fleming v. Carroll Pub. Co.*, 621 A.2d 829 (D.C.1993) (*Fleming II*),[2] the trial judge concluded that the landlord was the "prevailing party." Although this conclusion might plausibly be disputed where, as in this case, the landlord recovered less than one-fifth of the amount it sought,[3] I will not quarrel with it here, especially since the tenant did not file a counterclaim. I do, however, question the affirmance by my colleagues in the majority of the quantum of the landlord's victory.

1. The lease agreement between the parties contained two provisions, each of which arguably entitled the landlord to an award:

   ¶ 5.06H: Tenant shall pay to Landlord "all court costs, legal fees, and expenses incurred by Landlord in effecting the collection of the rent from the Tenant, the curing of any default on the part of the tenant in performance of any of its obligations hereunder, and/or obtaining possession of the Premises."
   ¶ 8.5: "In the event of any dispute under this Lease, the prevailing party shall be entitled to recover, in addition to any other remedy or relief to which it is entitled, reasonable attorney's fees, expert witness

and consultant fees, and the costs of litigation or arbitration."

2. "To be deemed a 'prevailing party,' it is necessary only that the plaintiff succeed on any *significant* issue in litigation which achieves *most of the benefit* the parties sought in bringing the suit." *Fleming II*, 621 A.2d at 837 n. 14 (emphasis in original).

3. *See Chang v. Louis & Alexander, Inc.*, 645 A.2d 1110, 1115–16 (D.C.1994), holding that, at least where the tenant has filed a counterclaim, the landlord and the tenant may both be prevailing parties for counsel fee purposes with respect to individual claims or issues.

In this case, the landlord was awarded damages in the amounts of $7,870 for repair of its air conditioning unit and $22,778.15 for rent owed by Bannum as a holdover tenant. However, the landlord's request for $141,500 in estimated restoration costs was denied in its entirety. Thus, although the landlord won two comparatively minor battles, the tenant prevailed with respect to what one might call the "Big Enchilada," *i.e.*, the issue that, on its face, appeared to matter the most. Common sense tells us that, at least in the absence of considerations not articulated by the trial court, the landlord would have become richer and happier with recovery of the claimed restoration costs, even if such a win had been coupled with a loss on each of the smaller claims.

"[T]he degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor *critical* to the determination of the size of a reasonable fee." *Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 790–91, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (emphasis added).[4] It is noteworthy that the word "goals" is in the plural; success must be judged on the basis of the outcome of the case as a whole. Put another way, "the amount of the award should be proportionate to the extent to which the plaintiff prevails in the suit." *Marr v. Rife*, 503 F.2d 735, 744 (6th Cir.1974) (*Marr I* ) (quoting *Schaeffer v. San Diego Yellow Cabs, Inc.*, 462 F.2d 1002, 1008 (9th Cir.1972)). Success on a majority of the claims is not equivalent to overall victory if the party seeking to recover counsel fees lost on the one which it wanted most and for which it presumably fought the hardest. In this case, the claim for restoration costs not only involved a far larger potential recovery than the other

two claims, but it also required expert testimony for both parties and was therefore likely to have resulted in the commitment of a very substantial amount of attorney time.

The trial judge, however, did not analyze the case in that way. She held that because the landlord was successful with respect to two of the three claims, the award of counsel fees should be reduced by "one third, which represents a reasonable calculation of the measure by which plaintiff prevailed in this action." Order of July 3, 2008, at p. 5. I am unable to agree with the notion that, for counsel fee purposes, it makes no difference whether the plaintiff prevailed on a claim for $7,870 or one for $141,500.00. Under the trial judge's analysis, affirmed by this court, each such award supposedly represents success with respect to one-third of a lawsuit. As I understand the trial judge's order, affirmed by my colleagues, the exercise was essentially a mechanical one—if a party prevails on two of three claims, *whatever those claims are*, then under a lease provision authorizing an award of counsel fees, that party recovers two-thirds of its fees.

In my view, this analysis—counting the number of claims won or lost, without explicitly considering the content of each—impermissibly exalts form over substance. As the Supreme Court explained almost a century ago in a different but relevant context, "the courts will not permit themselves to be blinded by mere forms ... but will deal with the substance of the transaction ... as the justice of the case may require." *Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918). More recently, we have reiterated that "[c]ourts deal with the substance rather than the form of a transaction," and

4. The court added that this consideration is not a proper factor in the determination

whether *any* award should be made.

that they must assess "the practical consequences of the existing situation." *EDM Assocs. Inc. v. GEM Cellular*, 597 A.2d 384, 389 (D.C.1991) (citation omitted). If we were to look only to the "form" of what occurred here—the landlord prevailed on two of three claims—then the result reached by the trial judge would be correct. If we consider substance, however, then, so far as we can determine from what the judge has written, the landlord won a far less impressive victory with respect to the case as a whole. Thus, in the absence of a more persuasive justification for the result reached, it logically follows that the counsel fee award should have been considerably smaller.

I do not mean to suggest that the measure of a party's victory should necessarily be determined by the dollar amounts of the successful claims, as compared to the sums sought but not recovered,[5] though this approach might represent a sound starting point. I agree with the statement of the court in *Marr v. Rife*, 545 F.2d 554 (6th Cir.1976) (*Marr II* ), addressing a different but somewhat analogous issue, that

> the proportionate share concept is only a rule of thumb to guide the district court's discretion, . . . and that an evaluation by the trial court should be made to determine the effort expended against each defendant and accordingly the pro rata division of attorney fees.

*Id.* at 556. In my view, however, an award reached by simply comparing the number of claims won with those lost, and basing the fee on that comparison, without any

consideration of the importance of each claim in the litigation as a whole,[6] or of the amount of attorney time devoted to each, cannot be sustained even when we are reviewing the trial court's decision pursuant to a deferential abuse of discretion standard. Accordingly, I would vacate the award of counsel fees and remand the case with directions to reconsider the issue in conformity with the principles articulated in this opinion. However, in light of the sound policy against turning disputes over counsel fees into a second major litigation, *Pierce*, 487 U.S. at 563, 108 S.Ct. 2541, I would encourage the trial court to make the proceedings on remand as uncomplicated as possible, or better still, explore what might be done to help the parties to reach a negotiated settlement, and thus to avoid "second round" expenditures which could nullify or drastically reduce any recovery ultimately obtained.

---

5. *E.g.*, if a plaintiff sues for $1,000,000 in pain and suffering and the jury only awards him $50,000, this does not mean that the amount of attorney time devoted to the issue was only one twentieth of what it would have been if the plaintiff had recovered the full amount prayed for.

6. It is conceivable, I suppose, that the landlord's attorneys devoted more time and effort

to the damage to the air-conditioning and to the rent owed than they did to restoration costs, because these two issues involved money out of the landlord's pocket rather than merely an additional hoped for recovery. If that was the basis for the trial judge's approach, however, there is no indication of it in the record before us.